# UNITED STATES DISTRICT COURT
Eastern District of Wisconsin

Monica Farr,

        Plaintiff,

                      Case No.

  v.

Paul J. Paikowski and
David P. Feyen,

Each in his individual capacity,

        Defendants.

# COMPLAINT

### I. NATURE OF ACTION

Monica Farr brings this civil action under Title 42 U.S.C. §1983 against Waukesha Police Officer Paul J. Paikowski and Detective David P. Feyen in order to obtain monetary damages for injuries arising from the deprivation of rights secured to her by the Fourth and Fourteenth Amendments to the Constitution of the United States of America.

## II. JURISDICTION AND VENUE

### A. Jurisdiction

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B Venue

202. The Eastern District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III. PARTIES

### A. Plaintiff

301. The Plaintiff Monica Farr is an adult resident of the State of Wisconsin.

### B Defendants

302. On information and belief, Defendant Paul J. Paikowski is an adult resident of the State of Wisconsin.

303. At all times material to this lawsuit, Defendant Paikowski was employed by the Waukesha Police Department.

304. At all times material to this lawsuit, Defendant Paikowski was acting within the scope of his employment.

305. At all times material to this lawsuit, Defendant Paikowski was acting under

color of state law.

306. On information and belief, Defendant David P. Feyen is an adult resident of the State of Wisconsin.

307. At all times material to this lawsuit, Defendant Feyen was employed by the Waukesha Police Department.

308. At all times material to this lawsuit, Defendant Feyen was acting within the scope of his employment.

309. At all times material to this lawsuit, Defendant Feyen was acting under color of state law.

**IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION**

401. On Saturday, January 17, 2009, at 2:54 in the afternoon, Waukesha Police Officer Daniel J. Mailloux responded to a non-emergency call to Complete Car Care, located at 461 W. Sunset Dr., in Waukesha, Wisconsin, in reference to a citizen's complaint.

402. Complete Car Care is located inside the Sunset Shell gas station at 461 W. Sunset Dr., in Waukesha.

403. Mindy Friedeck, who was working alone at the Complete Car Care, called the police because a black man was causing a disturbance and had threatened to burn the place down.

404. Ms. Freideck reported to Officer Mailloux that a black man,

approximately 30 years of age, walked into the service station while Ms. Freideck was helping another customer.

405. Ms. Freideck reported that the black man was walking back and forth behind that customer, yelling at someone on a cell phone.

406. Ms. Freideck reported that the black man was very animated and loud while he was on the cell phone, which was causing a disturbance in the shop.

407. Ms. Freideck reported that after about five minutes, her customer left the store, and she asked the man on the phone if she could help him.

408. The black male told Ms. Freideck that he wanted someone to plug a tire.

409. Ms. Freideck told him that it would be approximately one hour before she would have anyone who would be available to work on the tire.

410. Ms. Freideck reported that upon hearing this, the black male became upset and rude, and he began asking why she wasn't going to help him, and became even more disruptive than he had previously been while speaking on the phone.

411. Ms. Freideck reported that the black male started using loud profanity, calling her names such as cracker and stupid white bitch, for a period of two to three minutes, at which point she told him to leave.

412. Ms. Freideck reported that the black male then left, and got into a green Oldsmobile; she provided Officer Mailloux with the license plate number of the car.

413. Ms. Freideck reported that about one minute later, the black man walked

4

back into the store and said, "You better watch yourself. I'm going to come back and burn this place down."

414. Ms. Freideck asked the police to arrest the black man for disorderly conduct.

415. Officer Mailloux ran the license plate given by Ms. Freideck, and determined that the vehicle belonged to Monica Farr.

416. Officer Mailloux had another unit dispatched to meet him at Ms. Farr's home, so that Ms. Farr could be questioned.

417. The police found Ms. Farr standing in her parking lot with her son, working on a tire on her vehicle.

418. Officer Mailloux saw immediately that neither Ms. Farr nor her son matched the description of the suspect in question.

419. The police asked Ms. Farr about her presence at the gas station with the black man whom they suspected of disorderly conduct.

420. Ms. Farr identified herself to the officers.

421. Officer Mailloux asked her what her vehicle had been used for in the past couple hours.

422. Ms. Farr indicated that she had been with a man whom she had picked up at the bus stop.

423. Ms. Farr stated that she had enlisted the help of the man because she was

not very familiar with the area, and she needed assistance with her car because her tire had a slow leak.

424. Ms. Farr told the police that she did not know the man, but that she picked the man up and gave him a ride in exchange for his assistance with her tire.

425. Ms. Farr told the officers that they had driven to some different places, and then she dropped the man off at the bus stop in front of SuperAmerica on S. Grand Ave.

426. Officer Mailloux stated that he did not believe Ms. Farr, but Ms. Farr maintained she had told him everything she knew about the man.

427. Ms. Farr was upset that the officer refused to believe her truthful recap of her afternoon.

428. Officer Mailloux told Ms. Farr that if she was untruthful with him or was found to be cooperating with the black male suspect, she could get into trouble as well.

429. Ms. Farr again maintained that the man had been a complete stranger to her and that she had no idea who he was.

430. Ms. Farr told the police that she would be willing to speak with them further if they needed more information in the future.

431. Officer Mailloux believed that Ms. Farr was untruthful because she displayed a "hyper-focused gaze," "elevated her voice," "diverted her eyes away," and "stuttered."

432.     Officer Mailloux believed that Ms. Farr knew who the suspect was and was aware of the incident that took place but was attempting to withhold the information so she would not get the suspect in trouble.

433.     Officer Mailloux then went to SuperAmerica, hoping to check their video surveillance cameras to possibly identify the suspect, but he was unable to do so.

434.     Officer Mailloux then reported that he had no other avenues to follow and suggested that the investigation be forwarded to the Detective Bureau for further investigation.

435.     Approximately one week later, City of Waukesha police had Ms. Farr under surveillance, because they suspected that she really knew the identity of this black man whom they suspected had committed disorderly conduct at the gas station.

436.     The Waukesha police were surveilling Ms. Farr's house on January 23, 2009.

437.     On that date, the police watched Ms. Farr leave her home, get into her vehicle, and start driving down the road.

438.     Ms. Farr was on her way to work for her shift as a Certified Nursing Assistant that was scheduled to begin at 2:00 p.m.

439.     Defendants Paul J. Paikowski and David P. Feyen, as well as other Waukesha police officers, followed Ms. Farr's vehicle for a few blocks and then pulled Ms. Farr over.

7

440. Officer Paikowski walked up to Ms. Farr's window. She handed him her driver's license and asked what this was about.

441. Officer Paikowski said he wanted to ask her some questions.

442. Ms. Farr asked if they could speak another time, as she was on her way to work as a CNA, and it was important that she not be late.

443. Officer Paikowski ignored Ms. Farr's request and asked, "Who were the two males you were talking to in your parking lot?"

444. Ms. Farr again asked what this was about, and asked if they could speak another time because she had to get to work.

445. Defendant Paikowski said, "This can't wait."

446. Ms. Farr said she needed to call her place of employment to tell them that she would be late and began to make that call on her cell phone.

447. Defendant Paikowski said, "I'm not going to play games with you. I will just arrest you and take you down to the station and go get my answers from your kids."

448. Defendant Paikowski then grabbed Ms. Farr by her arm, pulled her out of the car, took the cell phone out of her hands, and handcuffed her.

449. Defendant Paikowski then searched Ms. Farr's car and purse; he emptied her purse on top of her car, all without her consent.

450. Ms. Farr told Defendant Paikowski that he did not have her permission to

interview her children.

451. Defendant Paikowski told another officer to take Ms. Farr to the police station.

452. Ms. Farr was taken to the police station.

453. At the police station, Ms. Farr was required to remove her shoes and her coat and take her nursing badge off her uniform.

454. She was subjected to a pat-down search.

455. After being searched, Ms. Farr was locked in a holding cell where she was handcuffed to the wall.

456. In the meantime, despite Ms. Farr's announcement that the officers did not have permission to interview her children, the officers who had been with the Defendants when they stopped Ms. Farr attempted to speak with Ms. Farr's children.

457. After Ms. Farr had been held for about an hour, Defendant Paikowski came into the holding area.

458. Ms. Farr said she wanted to talk to a lawyer because he (Defendant Paikowski) had falsely arrested her.

459. Defendant Paikowski said Ms. Farr could not have a phone call.

460. Ms. Farr pleaded that she had her lawyer's phone number right in her purse, but Defendant Paikowski would not allow her to call her lawyer.

461. Ms. Farr asked if she could call her children, her husband, or her

employer.

462. Defendant Paikowski again told Ms. Farr that she could not use the phone.

463. The Defendants never read Ms. Farr her Miranda rights at any point during her detention or interrogation.

464. The Defendants did not permit Ms. Farr to contact her attorney at any time during her detention or interrogation.

465. Throughout the entire period of Ms. Farr's detainment, the Defendants held her cell phone.

466. They called numbers in her cell phone without her permission, and answered calls coming into her cell phone without her permission.

467. Defendant Paikowski answered the phone when Ms. Farr's employer called to see why she was not at work.

468. He told Ms. Farr's employer that Ms. Farr was being detained at the police station.

469. The Defendants also spoke to Ms. Farr's husband on Ms. Farr's cell phone and told Ms. Farr's husband, "We know your wife is lying" or words to that effect.

470. The Defendants took Ms. Farr into an interrogation room.

471. They told Ms. Farr that she was suspected of obstructing a police investigation.

472. They started questioning her about the January 17, 2009, gas station incident.

473. Ms. Farr stated that she would not speak with Officer Paikowski because of the way he treated her.

474. Defendant Paikowski left the room, and Defendant Feyen continued to question Ms. Farr.

475. Ms. Farr explained that she had not previously lied to the police when she said she gave them all the information she had, and she told Defendant Feyen what had happened on January 17th, just as she had told Officer Mailloux when he had interviewed her that day.

476. The information that Ms. Farr gave in response to Defendant Feyen's questions was consistent with her original account to Officer Mailloux.

477. As a result, the Defendants entertained the possibility that Ms. Farr had been in fact truthful.

478. They eventually decided to release Ms. Farr.

479. Defendant Paikowski told Ms. Farr that he was a good guy, and that he had voted for Obama, so she should not be mad at him.

480. Ms. Farr was held for hours before she was released.

481. Ms. Farr was never charged with any crime in connection with this incident.

482. Ms. Farr missed her shift at work due to her unlawful arrest, and she was almost fired for missing a scheduled shift.

483. As a result of having learned that Ms. Farr was being held by police, Ms. Farr's employer took Ms. Farr off the work schedule and would not allow Ms. Farr to return to work; she was only permitted to return to work after Ms. Farr's attorney contacted her employer and explained the situation.

484. All of the officers, including the Defendants, who interacted with Ms. Farr throughout the incidents described above were white males.

485. Ms. Farr, who is a black female, felt that the unreasonable and humiliating manner in which she was treated was racially motivated.

## V. VIOLATIONS OF LAW

### A. Fourth and Fourteenth Amendments

501. The Defendants stopped Ms. Farr without reasonable suspicion that she had committed or was about to commit a crime, in violation of her constitutional right to be free of unreasonable seizures, guaranteed by the Fourth and Fourteenth Amendments to the United State Constitution.

502. The Defendants seized and detained Ms. Farr without a warrant and without probable cause to believe that she had committed a crime, in violation of her constitutional right to be free of unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments to the United State Constitution.

503. The Defendants conducted an unreasonable and warrantless search of the Plaintiff's car, purse, person, and cell phone, all in violation of her constitutional right to be free of unreasonable searches, guaranteed by the Fourth and Fourteenth Amendments to the United State Constitution.

### B. Sixth, Fifth, and Fourteenth Amendments

504. The Defendants detained Ms. Farr for hours without allowing her to contact her attorney, and despite her requests to contact an attorney and to make no statement without the benefit of counsel, the Defendants interrogated Ms. Farr without allowing her to have any attorney present, all in violation of her constitutional right to counsel guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United State Constitution.

### C. First and Fourteenth Amendments

505. The Defendants invaded the sphere of Ms. Farr's personal life, by attempting to interrogate her minor children, by answering her cell phone and speaking to her employer, and by using her cell phone to contact and speak with husband, all of which violated her constitutional right to privacy, guaranteed by the First and Fourteenth Amendments to the United States Constitution.

## VI. DAMAGES AND EQUITY

### A. Damages

601. By virtue of unlawful actions alleged above, the Plaintiff has suffered a

loss of her right to be free of unreasonable searches and seizures.

602. The Plaintiff has also suffered emotional distress, embarrassment, humiliation, loss of reputation, financial losses, and other damages for which she should be compensated in an amount deemed just by the Court.

603. Because the acts of the individual Defendants that are alleged herein were carried out maliciously or with reckless disregard for the Plaintiff's fundamental rights, the Plaintiff seeks awards of punitive damages against the individual Defendants in an amount sufficient to deter them from repeating such behavior in the future.

## VII. CONDITIONS PRECEDENT

701. All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. DEMAND FOR JURY TRIAL

801. The Plaintiff hereby demands a trial by jury of all issues triable of right to a jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, Monica Farr prays that the Court grant judgment against the Defendants, awarding her:

901. Monetary damages in an amount that will fairly compensate her for her injuries;

902. Punitive damages in amount that will deter the Defendants from

repeating such conduct in the future;

903. Her costs, attorneys' fees, and litigation expenses as well as any further relief this Court deems just.

Dated this 22nd day of August, 2011.

Respectfully submitted,
Monica Farr, Plaintiff,
By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284
ANDREA J. FARRELL
State Bar No. 1064773

131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone:       (608) 283-6001
Facsimile:   (608) 283-0945
E-mail:      jsolson@scofflaw.com

  /s/ ANDREA J. FARRELL
  _____

ANDREA J. FARRELL
ATTORNEYS FOR PLAINTIFF