# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MONICA FARR,**

           Plaintiff,

      -vs-                                                                             **Case No. 11-C-789**

**PAUL PAIKOWSKI,**
**DAVID FEYEN,**

           Defendants.

## DECISION AND ORDER

Monica Farr alleges that Paul Paikowski and David Feyen, City of Waukesha police detectives, arrested her without probable cause; that Detective Paikowski unlawfully searched her person, vehicle, purse and cell phone; and that she was unlawfully detained for 2 ½ hours before she was released without being charged with a crime. The Court finds that Farr is entitled to summary judgment on her claim for excessive detention after the arrest. The defendants are entitled to summary judgment on the balance of Farr's claims.

## BACKGROUND

On the afternoon of Saturday, January 17, 2009, the City of Waukesha Police Department received a complaint about an incident at the Complete Car Care auto repair shop located on the corner of West Sunset Drive and South West Avenue in Waukesha. According to a female employee, a man came into the store that afternoon talking very loudly on his cell phone and causing a disturbance. After she was done helping a customer, the man

told her he needed assistance getting a leaky tire plugged. She responded that it would be about an hour before anyone was available to make the repair. In response, the man started yelling and behaving rudely and disruptively. The employee told the man he did not need to be rude to her. This made the man more upset, and he started cursing at her, calling her "cracker" and "stupid white bitch." After several minutes, the store employee asked the man to leave. The man left the building and walked over to a green Oldsmobile. The employee obtained the license plate number on the car.

About a minute after he left the shop, the man walked back in and said, "You better watch yourself, I'm going to come back and burn this place down." The store employee reached for the phone. The man left again, got into the green Oldsmobile and headed east on Sunset Drive.

City of Waukesha Police Officer Daniel Mailloux responded to the complaint. Officer Mailloux obtained a written statement and a description of the man. According to the store employee, the man terrified her and she believed his threat.

After leaving Complete Car Care, Mailloux ran the license plate information on the green Oldsmobile. The registration records showed that the car was registered to the plaintiff, Monica Farr, and that she lived at 1512 Big Bend Road in Waukesha, less than one mile from Complete Car Care. Mailloux went to this address where he found an apartment complex with a parking lot. When he arrived, Farr and her son, Montre, were in the parking lot near the Oldsmobile. Mailloux approached Farr and her son and began to ask questions about the vehicle and what it had been used for during the last few hours. Farr refused to

allow Mailloux to speak with Montre. Mailloux perceived that Farr's posture was defensive; she crossed her arms and started to move towards her apartment. Farr told Mailloux that earlier that day she was with a male subject who she picked up at the bus stop at the intersection of South West Avenue and Sunset Drive, and that she had no idea who he was. Farr stated that she was not from the area and needed assistance getting a slow leak in her tire repaired, so she picked this man up so he could help her get the tire fixed. Farr told Mailloux that they drove to four different places and that she ultimately dropped him off at the bus stop in front of the Super America gas station on South Grand Avenue. Farr was unable to tell Mailloux the man's name. She told him that she had never met him before and did not know how to contact him.

Officer Mailloux described the incident at Complete Car Care to Farr, and told her he was investigating the incident. Mailloux perceived that, in response, Farr was indifferent and became defensive. Based on his experience interviewing other witnesses, Mailloux thought Farr's reaction was unusual. Mailloux told Farr that he did not believe her story. In response, Farr became very agitated, almost hostile. Her gaze became hyper-focused and her voice was elevated. When Mailloux pressed for more information, Farr diverted her gaze. When he asked about the identity of the male subject, her speech became stuttered as if she was searching for words. Mailloux believed that Farr knew who the man was and knew more about the incident at Complete Car Care, but that she was withholding information to avoid getting him into trouble. Based on his interaction with her, Mailloux believed that Farr was an intelligent, capable individual who had clear communication skills, a nicely furnished

apartment in a good neighborhood, and was relatively successful. Under the circumstances, Mailloux thought that Farr's explanation that it was necessary to pick up a total stranger, whose name she still did not know, to find a service station that would repair her tire, was unreasonable. Coupled with what he perceived to be her indifference and defensiveness, Mailloux believed that Farr was lying to him. However, Mailloux wanted to diffuse the situation and give Farr a second chance to be truthful. Before leaving, Mailloux told Farr that it might be necessary for detectives to talk with her later.

At deposition, Farr testified that on the date in question, a Buick that belonged to her ex-husband, Reginald Steel, had a flat tire, so Farr and Montre took her car, the green Oldsmobile, and went in search of a local store that handled tire repairs. According to Farr, they first drove to Colburn's Citgo on the corner of West Sunset Drive and South Grand Avenue. Colburn's Citgo handles tire repairs, but no one who could perform tire repairs was there at the time. A man was waiting at the bus stop on the corner of West Sunset Drive and South Grand Avenue. After discovering that they could not get the tire repaired at Colburn's Citgo, Farr approached the man and asked whether he knew of any place where they could get a tire fixed. Neither Farr nor Montre knew the man. The man told them that he knew of several different places where they could get a tire fixed. He offered to ride with Farr and her son to show them the places. Farr agreed, and the man got into the car. They drove to several places in the vicinity of Sunset Drive, finally arriving at Complete Car Care.

According to Farr, when they arrived at Complete Car Care, the man volunteered to go inside to find out whether someone could fix the flat tire. She saw him go into the store.

When the man came out of the store, he told Farr that he had to get to work and asked her to drop him off at the bus station. After dropping him off, Farr and her son drove to Auto Zone to try to get some Fix-a-Flat before they returned to the parking lot outside their apartment complex. Despite having invited the man into her car and riding to various local stores with him, Farr never got the man's name.

Detective Paikowski was assigned to follow-up on the incident. When he began his investigation, he reviewed Officer Mailloux's Incident Report. The report contained a description of Farr's Oldsmobile and the events of January 17 as reported by Farr to Officer Mailloux. It also described what Mailloux perceived as Farr's indifferent and defensive behavior. After reviewing the report, Paikowski concluded that there was probable cause to believe that Farr was lying and interfering with the investigation into the incident and Complete Car Care. Paikowski thought the physical characteristics described by Mailloux suggested that Farr was not being truthful. He found it incredible that Farr picked up a complete stranger and gave him a ride in her car. He could not understand why the man, who Farr said was a stranger and had no stake in whether the tire got repaired or not, became so agitated and threatened to burn the building down when he learned that it would take an hour to get someone to repair the tire. Paikowski also did not understand why Farr would not let Mailloux speak to her son about the incident. Paikowski concluded that, in his experience as an officer and human being, the entire sequence of events described by Farr sounded like it was fabricated to protect the man who had caused the disturbance.

In addition to reading Mailloux's report, Paikowski also spoke with Officer Mailloux. Paikowski told Mailloux that the report contained sufficient evidence that Farr was lying and interfering with the investigation. Mailloux agreed that he believed Farr had not been truthful. Paikowski believed that there was probable cause to arrest Farr for obstructing the investigation pursuant to Wis. Stat. § 946.41. However, he first attempted to contact Farr to talk to her about why her story was unbelievable. Sometime between January 17 and January 23, 2009, Paikowski tried to contact Farr by knocking on her door, but was unsuccessful.

On the afternoon of Friday, January 23, 2009, Detective Paikowski was parked across the street from Farr's residence in an unmarked car, surveying the residence and parking lot with binoculars. Shortly after Paikowski began this surveillance, a Buick pulled out of the parking lot. He pulled out behind the Buick, ran the license plate and discovered the vehicle was registered to Reginald Steel. At that time, Paikowski did not know that Steel was Farr's ex-husband. The rear windshield of the Buick was tinted. At a certain level of tint, tinted windows are not legal in Wisconsin.[1]

Paikowski followed the Buick for approximately 1.75 miles, trying to see if he could identify the driver or determine the number of people in the vehicle, but he was unable to do so. Due to the suspected tinted window violation, Paikowski pulled the Buick over at the intersection of Grand Avenue and Williams Street. Paikowski approached the Buick and asked for a driver's license, which identified the driver as Farr. Paikowski returned to his vehicle and called dispatch to have the status of Farr's license checked. After determining

---

[1] Steel had previously received a ticket for over-tinted windows in the Buick. Steel testified that the tint was applied after-market.

that Farr's license was valid, Paikowski returned to the driver's side of the Buick. He told her that he had been assigned to the investigation of the incident at Complete Car Care, and that he thought she had not been truthful about the circumstances surrounding the incident and was obstructing the investigation. Farr raised her voice to Paikowski, saying she did not lie to the police, she would not let anyone talk to her kids, and she was being hassled by the police. Paikowski concluded that he was not going to be able to have a civil conversation with Farr about the incident, so he arrested her for obstruction of justice. Farr was arrested at approximately 3:02 p.m. Detective Feyen was on the scene of the car stop as Paikowski was speaking to Farr.

Paikowski opened Farr's car door, instructed her to step out of the vehicle, placed his hand on her arm, and guided her out of the vehicle. Paikowski handcuffed Farr and pat-searched her person. Farr continued to yell at him during the pat-search process. During the arrest, Paikowski requested a transport vehicle. After Paikowski searched Farr, Officer Greg Kermendy, who arrived in the transport vehicle, escorted her to the rear seat of the transport vehicle. During the entire traffic stop, arrest, and transfer to the transport vehicle, the officers used no physical force other than guiding Farr from the vehicle and performing the pat-down search, and Farr sustained no physical injuries.

Detective Paikowski then searched the Buick by looking in the back seat and searching the front seat, center console, glove box, and visors.[2] The purpose of Paikowski's search was to ensure that no weapons or items of value remained in the car while Farr was

---

[2] There is an issue of fact as to whether Paikowski searched the trunk of the car, but as discussed below, this dispute is not material to the Court's disposition.

in custody and to determine whether there was anything in the car that might show that someone related to the investigation was associated with Farr or the vehicle, such as notes, contacts, letters, mail, change of address information, registration information, or vehicle title changes. After the search, Paikowski locked the doors of the Buick. He had Farr's cell phone and purse in his possession, and he checked Farr's purse to be sure it was not holding anything that could be harmful, such as weapons or needles, or evidence related to Farr's obstruction of justice. Paikowski and Feyen went to Farr's residence and rang the bell in the hopes of finding the Buick's owner or Farr's children, but no one answered the door.

At the Police Department, Farr was pat-searched by the transport officer. She removed her shoes, coat and work badge upon the officer's request. The transport officer placed her in a holding room and handcuffed one of her hands to a ring affixed to a wall. Arrestees are generally placed in a holding room at the Waukesha Police Department for security reasons when they are not going to be locked in a jail cell. The door to the room is kept open so they can be monitored, and they are handcuffed to the wall so they cannot walk around or out of the Police Department. While she was in the holding cell, Farr requested to have her purse so she could use her cell phone to call an attorney. The transporting officer told her she would have to wait until Paikowski and Feyen arrived.

Once back at the department, Detective Paikowski completed some office work, like attending to other cases and returning phone calls. Paikowski searched Farr's purse in more detail to determine whether it contained any information relevant to his investigation of her obstruction. He also searched her cell phone, looking at the history of incoming and

outgoing calls and the contact list. Paikowski and Feyen removed Farr's handcuffs and took her into an interview room. Paikowski led the discussion with Feyen looking on. Paikowski attempted to explain to Farr that he had been tasked with the investigation of the Complete Car Care incident, and that it was being investigated because of the gravity of the threat to burn the building down. During this time, Farr kept repeating that she had already told the police what happened, that she did not know the man, and that no one could talk to her kids. Paikowski was not sure whether Farr was even listening to him. Feyen believed that Farr was not receptive to Paikowski's conversation, and observed that she seemed very upset and angry with Paikowski. For a period of time, Paikowski left the room and Feyen attempted to calm Farr.

At some point, Paikowski changed tactics and tried to walk through the story that Farr had been telling. Farr calmed down, and eventually she agreed that from an outside perspective her account could be viewed as unbelievable. She also agreed that approaching complete strangers for help can be dangerous. Farr's version of events did not change, so Paikowski asked Farr whether she would agree to look at a lineup if there ever were one for this incident. He also began making arrangements to return Farr to her vehicle. Neither of the officers gave Farr a Miranda warning.

During the time that Paikowski had Farr's cell phone, he answered the phone at least twice, once when Reginald Steel called and once when Farr's employer called. When Steel called, Steel and Paikowski generally discussed the incident at Complete Car Care, and Steel insisted that Farr was telling the truth. Paikowski maintains that he did not make any

outgoing calls on Farr's cell phone; Farr claims that Paikowski made at least one outgoing call.

Farr was returned to her vehicle at approximately 5:26 p.m., so she was in custody for approximately 2 ½ hours. The City of Waukesha Police Department did not press criminal charges against Farr. After January 23, 2009, Detective Paikowski attempted to make contact with Farr about viewing a photo array, but Farr never responded.

**ANALYSIS**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). The Court considers each party's motion individually to determine if that party has satisfied the summary

judgment standard. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557, 583-84 (N.D. Ind. 2010).

To succeed on a claim for false arrest, Farr must be able to demonstrate that she was arrested without probable cause. *Morfin v. City of E. Chi.*, 349 F.3d 989, 997 (7th Cir. 2003). Probable cause is an absolute bar to a false arrest claim. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 301-02 (7th Cir. 2011). Probable cause exists if, at the time of the arrest, the facts and circumstances within the defendant's knowledge "are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Lawson v. Veruchi*, 637 F.3d 699, 703 (7th Cir. 2011).

When Farr was stopped while driving her ex-husband's Buick on January 23, 2009, Detective Paikowski had probable cause make the traffic stop because the car had tinted windows. It is undisputed that the rear window was tinted, which is permitted after-market only if the window allows the passage of at least 35% of visible light. Wis. Admin. Code Trans. § 305.32(5)(b); *United States v. Paoloca*, No. 94-1604, 1994 WL 534760, at *3 (7th Cir. Sept. 30, 1994) ("the lack of a front license plate and tinted windows traveling on the highways in the State of Illinois gave the trooper probable cause to believe the defendant was violating the laws of the State of Illinois");*United States v. Hernandez-Rivas*, 513 F.3d 753, 758-59 (7th Cir. 2008) ("An officer has probable cause for a traffic stop when he has an objectively reasonable basis to believe a traffic law has been violated"). Moreover, if Paikowski knew that Farr was driving the car, he was also entitled to stop (and then arrest)

-11-

Case 2:11-cv-00789-RTR    Filed 01/14/13    Page 11 of 16    Document 41

her because he had probable cause to believe that Farr was lying and obstructing the investigation into the threatened arson at Complete Car Care. Wis. Stat. § 946.41(2)(a) (defining obstruction as "knowingly giving false information to [an] officer or knowingly placing physical evidence with the intent to mislead the officer in the performance of his or her duty . . ."). Probable cause was established by Farr's previous interactions with Officer Mailloux, which Paikowski learned about by speaking to Mailloux and reading his report. Both men reasonably thought that Farr was lying because her explanation about how she picked up a complete stranger to help her find a shop to fix her flat tire seemed convoluted and absurd. Implausible or unbelievable scenarios can support a finding of probable cause. *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004).

Having determined that there was probable cause for Farr's arrest, her search-related claims are easily dealt with. It is "well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). Under this exception, police officers may "conduct a plenary search of the arrestee's person and the area within his immediate control, that is, 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008) (quoting *Chimel v. Cal.*, 395 U.S. 752, 763 (1969)). Such areas may include, as in the instant case, the arrestee's purse or cell phone. *See, e.g., United States v. Urbina*, No. 06-CR-336, 2007 WL 4895782, at *11-14 (E.D. Wis. Nov. 6, 2007) (collecting cases) (citing *United States v. Finley*, 477 F.3d 250, 260 (5th Cir. 2007) (cell phone lawfully searched incident to arrest); *United States*

*v. Garcia*, 605 F.2d 349, 355 (7th Cir. 1979) (wallet, purse or shoulder bag)). Farr argues that the searches at the police department were not justified as an incident to her arrest, but "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803 (1974). With respect to the car, police may search a vehicle incident to a recent arrest if the arrestee is "within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009). Paikowski denies searching the trunk, but even if he did, Paikowski was entitled to search the entire car because a search could have revealed evidence suggesting or demonstrating that Farr did in fact know the identity of the arson-threat suspect. For similar reasons, the search of Farr's vehicle was justified under the automobile exception to the warrant requirement. *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) ("When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks") (citing *United States v. Ross*, 456 U.S. 798, 823-24 (1982)); *United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir. 2009).

Finally, Farr argues that the length of her post-arrest detention was unreasonable. A policeman's "on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975).

-13-

Case 2:11-cv-00789-RTR    Filed 01/14/13    Page 13 of 16    Document 41

"Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly." *Id.* at 114. "The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships. . . . When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty." *Id.* Accordingly, the "Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.*

A jurisdiction that provides "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). However, "this is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested

-14-

individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility." *Id.*

The defendants concede that the real purpose for arresting Farr was simply to interrogate her about the man involved in the Complete Car Care incident and then let her go. This concession renders Farr's detention *per se* unreasonable under *Gerstein*. By analogy to the example given in *McLaughlin* – that a delay to gather evidence justifying the arrest renders the detention unreasonable – it is also unreasonable to use a lawful arrest as a pretext to gather evidence about a crime committed by another individual. Stated another way, the "sole permissible interest of the state in detaining a person after arrest is to ensure their presence at trial." *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1350 (7th Cir. 1985). The defendants obviously had no interest in ensuring Farr's presence at trial because they were not going to bring obstruction charges against her. Instead, the defendants arrested and detained Farr because they wanted to force her to answer questions about the man who made the threat at Complete Car Care. In the language of *Gerstein*, there were no "administrative steps incident to arrest" to complete, so Farr's entire detention was unlawful. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437 (7th Cir. 1986) (when the "administrative steps" under *Gerstein* "have been completed, the police must take the suspect before a magistrate to establish probable cause, or they must let him go"); *Wayland v. City of Springdale, Ark.*, 933 F.2d 668, 670 (8th Cir. 1991) ("*Gerstein* may be violated even in situations where probable cause for the arrest exists. . . . When the delay exceeds the time necessary to process the arrest, the delay is no longer reasonable, and the arrestee must be

released"). Defendants are not entitled to qualified immunity on this claim because the law was well-established at the time of the violation.

**IT IS HEREBY ORDERED THAT** the parties' respective motions for summary judgment [ECF Nos. 18, 22] are **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion.

Dated at Milwaukee, Wisconsin, this 14th day of January, 2013.

                                              **BY THE COURT:**

                                        _____
                                        **HON. RUDOLPH T. RANDA**
                                        **U.S. District Judge**